IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

RECEIVED

2014 OCT 16  A 11: 35

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DIST ALA

UNITED STATES OF AMERICA )
*ex rel.* Linda Reed and Jessica Smith, )
)
    Plaintiffs, )
) Case No: 2:14-cv-1060 MHT-WC
v. )
) **FILED UNDER SEAL**
FIRST CHOICE HOSPICE, INC., )
) **DO NOT PLACE IN PRESS BOX**
    Defendant. ) **DO NOT ENTER ON PACER**
)
) **DEMAND FOR JURY**

## *QUI TAM* COMPLAINT

Relators Linda Reed and Jessica Smith, on behalf of themselves and the
United States of America, allege and claim against Defendant First Choice
Hospice, Inc., as follows:

### JURISDICTION AND VENUE

1.    This action arises under the False Claims Act, 31 U.S.C. §§ 3729-33
(the "False Claims Act"). Accordingly, this Court has jurisdiction pursuant to 28
U.S.C. § 1331. Jurisdiction is also authorized under 31 U.S.C. § 3732(a).

2.    Venue lies in this judicial district pursuant to 31 U.S.C. § 3732(a),
because Defendant qualifies to do business in the State of Alabama, transacts

substantial business in the State of Alabama, transacts substantial business in this judicial district, and can be found here. Additionally, and as described herein, Defendant committed within this judicial district acts proscribed by 31 U.S.C. § 3729. Specifically, and *inter alia*, Defendant submitted and caused to be submitted within this judicial district false claims for hospice care for ineligible patients and made or used false records material to such claims.

## PARTIES

3.     Defendant First Choice Hospice, Inc. ("First Choice") is a Medicare-certified hospice provider offering hospice services throughout approximately 14 counties in southeastern Alabama. First Choice currently supplies hospice care to approximately 150 patients.  Through their experience at First Choice, Relators have learned that Defendant conducts its hospice operations with the fraudulent intent to defraud the United States by submitting claims for hospice care with complete disregard for patient eligibility, Medicare billing requirements, or compliance with other federal healthcare laws and regulations.

4.     Relator Linda Reed has extensive experience as a hospice social worker.  She received her Bachelor's of Social Work in 1996 and completed her Master's of Social Work in May 2012. On September 23, 2013, First Choice hired Ms. Reed to serve as Director of Social Services.  She discovered that First Choice makes little to no effort to comply with Medicare conditions of payment or

participation and routinely bills for patients who are not eligible for hospice care. As a result, Ms. Reed resigned from First Choice effective July 8, 2014.

5.      Relator Jessica Smith received her Bachelor's of Social Work in May of 2013. She has been employed by First Choice as a social worker since January 13, 2014 and obtained her Licensed Bachelor's of Social Work (LBSW) in July 2014. She is currently working towards her Master's in Social Work at Florida State University. Like Ms. Reed, upon employment with First Choice, Ms. Smith discovered that Defendant routinely admits and bills for Medicare patients that it knows are not terminally ill.

6.      Prior to filing this Complaint, Relators voluntarily disclosed to the United States the information upon which this action is based. To the extent that any public disclosure has taken place as defined by 31 U.S.C. §3739(e)(4)(A), Relators are the original source of the information for purposes of that Section. Alternatively, Relators have knowledge that is independent of and materially adds to any purported publicly disclosed allegations or transactions, and Relators voluntarily provided that information to the Government before filing this Complaint. Relators are serving contemporaneously herewith a statement of the material evidence in their possession upon which their claims are based.

## THE MEDICARE HOSPICE BENEFIT

### I. Background

7. Through the Medicare Program ("Medicare"), Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, et seq., the United States provides health insurance coverage for eligible citizens. Medicare is overseen by the United States Department of Health and Human Services through its Center for Medicare and Medicaid Services ("CMS").

8. Through the Medicare Hospice Benefit, Medicare pays for hospice care for certain terminally ill patients who elect to receive such care. *See* 42 U.S.C. § 1395d. A patient is deemed to be terminally ill if the patient "has a medical prognosis such that his or her life expectancy is 6 months or less if the disease runs its normal course." 42 C.F.R. § 418.3. In electing hospice care, a patient must agree to forego Medicare coverage for curative treatment. *See* 42 U.S.C. § 1395d. A patient may at anytime revoke his or her hospice election and resume Medicare Part A coverage. 42 C.F.R. § 418.28.

9. Defendant's aggressive, profit-maximizing business model represents an intrusion of greed into an institution founded upon philosophical, spiritual, and medical notions of charity and care giving. The impetus for the modern hospice movement in the United States is attributed to psychiatrist Dr. Elizabeth Kübler Ross, whose 1969 On Death and Dying is acknowledged to have altered modern

perceptions about care for the terminally ill. In the 1970s, U.S. hospices opened their doors as volunteer organizations dedicated to bringing comfort and humanity to terminal patients. Testifying in 1975 before the U.S. Senate Special Sub-committee on Aging, Kübler Ross stated: "We should not institutionalize people. We can give families more help with home care and visiting nurses, giving the families and the patients the spiritual, emotional, and financial help in order to facilitate the final care at home." In 1982, Congress created a provisional Medicare Hospice Benefit, made permanent in 1986 ("Hospice"). By 1990, 800 hospice companies were caring for 76,491 patients, with an average length of stay of 48.4 days.

10. From such humble, altruistic roots, Hospice has become big business. Medicare Hospice payments rose from $205 million in 1989 to $9.2 billion in 2006, and are estimated to be well over $14 billion at the time of the filing of this complaint, according to a 2011 report by Bloomberg, "Aunt Midge Not Dying in Hospice Reveals $14 Billion Market." In the 1998 article "Hospice Boom Is Giving Rise to New Fraud," the *New York Times* recognized that the hospice infrastructure "was never designed to handle the expanding network of nursing homes, hospices, assisted-care centers and other services popping up to serve the nation's growing aging population." Since then, the situation has only gotten much worse: in late 2013, *The Washington Post* issued an investigative report

entitled, "Hospice Firms Draining Billions from Medicare," revealing that "over the past decade, the number of 'hospice survivors' in the United States has risen dramatically, in part because hospice companies earn more by recruiting patients who aren't actually dying." *The Washington Post* article drew its conclusions from data collected by hospices in California, but venture capitalists and other investors all across the country have been quick to perceive that Hospice represents a potentially unlimited stream of income for those who bring aggressive marketing, sales, and growth tactics into the new industry of care for the dying. Relators experienced through their personal first-hand knowledge and observations that Defendant is among the corporations who are fraudulently using hospice as a profit center by presenting false claims for *per diem* reimbursements for patients that they knew or should have known did not qualify for the Medicare Hospice Benefit.

## II. Hospice Benefits, Reimbursements, and Requirements

11. Hospice covers a broad set of palliative services for qualified beneficiaries who have a life expectancy of six months or less as determined by their physician. *See* 42 C.F.R. § 418.22. Hospice is designed to provide pain-relief, comfort, and emotional and spiritual support to patients with a terminal diagnosis. Qualified hospice patients may receive skilled nursing services, medication for pain and symptom control, physical and occupational therapy, counseling, home health aide and homemaker services, short-term inpatient care,

inpatient respite care, and other services for the palliation and management of the terminal illness. *See* 42 C.F.R. § 418.202.

12.     Through Medicare and/or Medicaid (indirectly through the States), the United States reimburses hospice providers for services to qualified beneficiaries on a *per diem* rate for each day a qualified beneficiary is enrolled. 42 C.F.R. § 418.302. Medicare or Medicaid makes a daily payment, regardless of the amount of services provided on a given day and even on days when no services are provided. Payments are made according to a fee schedule with four base payment amounts for the four different categories of care: routine home care (RHC), continuous home care (CHC), in-patient respite care (IRC), and general in-patient care (GIC).

13.     In return for the Hospice *per diem* payment, hospices are obligated to provide patients with all covered palliative services. *See* 42 C.F.R. § 418.202. The hospice must design a plan of care (POC) inclusive of all covered services necessary to meet the patient's needs. *See* 42 C.F.R. § 418.56. That POC must be in place prior to the hospice submitting a Medicare bill.

14.     Medicare imposes on hospice providers an annual per-patient average cap for reimbursements (the "Aggregate Cap"). The Aggregate Cap is set by CMS according to federal regulations, and in 2012 stood at $25,377.01 per patient. The Aggregate Cap is not related to expenditures on individual patients. Rather, it

limits the aggregate reimbursement a provider may receive from Medicare. A hospice provider's compliance is calculated by dividing its total submitted reimbursements over a year by the number of non-duplicative patients enrolled during that year. Thus, every first-time Medicare hospice patient enrolled increases a hospice's Aggregate Cap amount by $25,377.01.

15.    Medicare will not pay for hospice services provided to patients who are not terminally ill. *See* 42 U.S.C. §1395y. The hospice medical director and the patient's attending physician must certify that the patient is terminal prior to the patient's admission to hospice. 42 C.F.R. §418.25. Furthermore, it is a universal requirement of the Medicare program that all services provided must be reasonable and medically necessary. *See* 42 U.S.C. §1395y(a)(1)(A); 42 U.S.C. § 1396, *et seq.*; 42 C.F.R. § 410.50. Medicare providers may not bill the United States for medically unnecessary services or procedures performed solely for the profit of the provider. *Id.*

16.    Federal law authorizes Medicare administrative contractors ("MACs") and fiscal intermediaries ("FIs") to issue determinations as to the extent of Medicare coverage for particular items or services. *See* 42 U.S.C. 1395ff. Accordingly, Medicare Hospice MACs and FIs publish local coverage determinations ("LCDs") establishing requirements for and limitations on Hospice

coverage. *See, e.g.,* LCDs Published by Palmetto GBA. Medicare will not pay for hospice care provided to a patient who does not meet LCDs. *See* 42 U.S.C. 1395y.

17. To enroll as a Medicare provider, First Choice was required to submit a Medicare Enrollment Application for Institutional Providers. *See* CMS Form 855A. In submitting Form 855A, First Choice made the following "Certification Statement" to CMS:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

Form CMS-855A.

18. First Choice then billed Medicare by submitting a claim form (CMS Form 1450) to the FI responsible for administering Medicare hospice claims on behalf of the United States. *See* CMS Form 1450. Each time it submitted a claim to the United States through the FI, First Choice certified that the claim was true, correct, and complete, and complied with all Medicare laws and regulations.

## DEFENDANT'S FRAUDULENT SCHEMES

19.     From at least 2010 to the present, the Defendant has defrauded the United States by submitting, or causing to be submitted, false or fraudulent claims to Medicare for ineligible hospice patients and by its failure to report past overpayments for ineligible patients and to reimburse Medicare for these overpayments.

20.     As a result of the Defendant's submission of, or causing the submission of claims that were knowingly false, or submitted with reckless disregard or deliberate ignorance of their falsity and through Defendant's "knowing" concealment or avoidance of its obligation to the Government, the United States was damaged by reimbursing the Defendant for providing hospice care to patients that were not eligible for the hospice benefit and by the failure of the Defendant to make repayments that Defendant knew were due and owing.

21.     Defendant acted with intentional disregard, reckless disregard, or deliberate ignorance to the statements of staff as well as their own records regarding the presence within First Choice's hospice census of ineligible patients.

22.     As a result, Medicare paid the Defendant monies that should not have been paid and the Defendant retained payments that should have been returned to Medicare.

## I.  Defendant Bills Medicare for Ineligible Hospice Patients

23.  The Defendant systematically defrauds Medicare and Medicaid by recruiting and cycling non-qualifying patients through its Hospice program.

24.  Defendant actively recruits, certifies, and bills the United States through CMS for ineligible patients.  Defendant perpetrates its scheme by systematically removing and destroying documents from patient records and falsifying documentation of terminal illness.  First Choice, while aware of these issues, has made no attempt to rectify them or to refund any overpayments to the United States and instead continues to bill the United States with full knowledge that its claims are false.

25.  Defendant systematically removes and destroys documents from patient records.  For example, on June 12, 2014, in the First Choice conference room in Elba, Alabama, Relator Jessica Smith witnessed First Choice nurses Monica Gulley and Christy Vidich systematically remove documentation inconsistent with a legitimate terminal diagnosis from patient charts and shred it. Nurses Gulley and Vidich destroyed this documentation at the direction of First Choice management in order to evade the detection of ineligible patients during a chart review.

26.  Defendant also systematically manipulates patient diagnoses so that patients appear to be eligible for the Medicare Hospice Benefit when they are not

in fact eligible and instructs its employees to do the same. For example, Relators Linda Reed and Jessica Smith heard Lisa Adams, Director of Quality Assurance, tell volunteers and other employees that "we make the diagnosis fit" at an April 26, 2014 volunteer training session. Furthermore, Ms. Reed is aware that Tara Norris, Outreach Development, consistently tells referring physicians that First Choice will "make" their patients appropriate for hospice regardless of the patient's actual condition.

27.    Accordingly, Defendant is aware, or should be aware, of the admission of ineligible patients.

28.    The following patients are examples of patients that Defendant admitted and billed to Medicare despite the knowledge that the patients were ineligible for hospice:

29.    Patient A.D., a 91-year-old female, was admitted to First Choice in Elba, Alabama on March 4, 2014 with a diagnosis of heart disease. First Choice medical director Dr. Charles Wood certified A.D. as terminally ill. When A.D.'s primary physician, Dr. William Reynolds, found out that his patient had been admitted to hospice, he immediately called and complained to First Choice Administrator Carolyn Burbank that his patient was not appropriate for hospice and demanded that she be discharged. Instead, First Choice management ignored Dr. Reynolds' medical judgment and retained A.D. Relator Jessica Smith visited

A.D. at her home and noted that the patient was very active. A.D. did not wear oxygen, was frequently outdoors, took daily walks with her boyfriend without experiencing shortness of breath, and was very talkative – all clinical facts at odds with Medicare guidelines for end-stage heart disease and which belie a legitimate terminal diagnosis.

30.     Patient B.G., a 71-year-old female, was admitted to First Choice Hospice in Elba, Alabama on April 21, 2014 with a diagnosis of COPD. First Choice medical director Dr. Charles Wood certified B.G. as terminally ill. Nurses' notes on June 5, 2014 indicate that B.G. was short of breath with minimal exertion and that the patient wears oxygen. However, when Relator Linda Reed made visits to the home on June 17 and 19, 2014, she noted that the patient sat outside in hot weather, did not wear oxygen, and did not exhibit any signs of shortness of breath when exerting herself (walking measureable distances) – all clinical facts at odds with Medicare guidelines for COPD and which belie a legitimate terminal diagnosis.

31.     Patient M.C., a 91-year-old female, was admitted to First Choice Hospice in Elba, Alabama on June 10, 2014 with a diagnosis of heart disease. Dr. Tanir Siddiq certified M.C. as terminally ill. When Relator Linda Reed called the patient's home to schedule a psychosocial assessment, the patient questioned her as to how First Choice got her name. When Ms. Reed told her that her doctor, Dr.

Siddiq, admitted her to the program, the patient told Ms. Reed that Dr. Siddiq is not her doctor and that she has never seen him before. She went on to state that she did not want First Choice in her home and that she was not terminally ill.

32.    Patient M.W., a 62-year-old female, was admitted to First Choice Hospice in Elba, Alabama on June 2, 2014 with a diagnosis of heart disease. M.W. was certified as terminally ill by medical director Dr. Charles Wood. While Relator Jessica Smith was in the patient's home on June 6, 2024 conducting a psychosocial assessment, a nurse from a local home health agency, Southeast Alabama Home Care, arrived. Ms. Smith told Shelia Johnson, the Patient Care Coordinator, that a home health nurse arrived during her visit and had discharged M.W. as "healed" for meeting all of her home health goals. The home health nurse later called Shelia Johnson and told her that the patient did not have end stage heart disease. First Choice quickly discharged the patient, only to readmit her on June 9, 2014 for the same diagnosis though her condition was clearly at odds with Medicare guidelines for heart disease and both First Choice and Southeast Alabama Home Care clinicians had already determined that M.W. was not terminally ill.

33.    Patient L.J.W., a 62-year-old male, was admitted to First Choice Hospice in Elba, Alabama on June 2, 2014 with a diagnosis of heart disease. First Choice medical director Dr. Charles Wood certified L.J.W. as terminally ill.

Patient L.J.W.'s spouse was admitted on the same day under the same diagnosis. However, when Relator Jessica Smith visited L.J.W. at home, she noted that the patient did not wear oxygen and cut grass professionally without difficulty or experiencing shortness of breath – clinical facts that render L.J.W.'s terminal heart disease diagnosis totally implausible.

34. Patient J.H., a 58-year-old male, was admitted to First Choice Hospice in Elba, Alabama on January 7, 2014 with a diagnosis of heart disease. First Choice medical director Dr. Charles Wood certified J.H. as terminally ill. However, the patient's records noted only "mild heart disease." J.H. walked several miles from Southeast Alabama Medical Center to a local Motel 6 where he was staying. He frequently abused alcohol and other controlled substances. J.H. was discharged on March 20, 2014. J.H.'s medical chart expressly demonstrates that he was not terminally ill and his actual condition is completely at odds with Medicare guidelines for heart disease, facts of which First Choice was aware and which plainly show Defendant's knowledge that its hospice claims for J.H. were false.

35. Patient J.M., a 74-year-old male, was admitted to First Choice Hospice in Elba, Alabama on July 15, 2013 with a diagnosis of frontal lobe dementia and certified by First Choice medical director Dr. Charles Wood. However, when Ashley Cruise and Relator Linda Reed visited the patient in his

home, they noted that J.M. was able to follow instructions and carry on complete conversations, speaking more than six words. J.M. was ambulatory and was able to dress himself. These are all clinical facts at odds with Medicare guidelines for terminal dementia and render First Choice's admission and terminal certification of J.M. false. On April 7, 2014, Dr. Charles Wood placed J.M. on discharge planning for failure to decline.

36.     Patient A.W., a 77-year-old female, was admitted to First Choice Hospice in Elba, Alabama, on July 26, 2013 with a diagnosis of Parkinson's disease. Dr. Linguiti, the patient's primary care physician, referred A.W. First Choice Hospice frequently marketed to Dr. Linguiti. However, when Relators Linda Reed and Jessica Smith visited the patient, they noted that A.W. is ambulatory and cooks and cleans for herself. In fact, A.W. independently cares for her disabled adult daughter. These objective facts do not comport with Medicare guidelines for end-stage Parkinson's disease and belie a terminal diagnosis and were known or should have been known by First Choice, who nevertheless falsely certified and re-certified A.W. as terminal. On May 6, 2014, A.W. was discharged as a part of a "mass discharge."

37.     Patient C.T., an 81-year-old female, was admitted to First Choice Hospice in Andalusia, Alabama on October 16, 2012 with a diagnosis of end-stage heart disease and was certified as terminally ill by First Choice medical director

Dr. Charles Wood. When Relator Jessica Smith visited the patient in her home, she noted that C.T. was independently ambulatory, did not wear oxygen and cared for 2-3 infant grandchildren on her own for up to three days a time – all clinical facts at odds with Medicare guidelines for end-stage heart disease and which belie a legitimate terminal diagnosis. Dr. Charles Wood discharged C.T. on May 5, 2014 for failure to decline.

38. Patient M.S., a 77-year-old female, was admitted to First Choice Hospice in Elba, Alabama on March 14, 2012 with a diagnosis of end-stage heart disease. Dr. Frank Crockett certified M.S. as terminally ill. When Relator Linda Reed visited the patient at her home, she noted that M.S. independently cared for her elderly bed-bound husband, did not use oxygen, was ambulatory and active in the community, and cooked and cleaned for herself – all clinical facts at odds with Medicare guidelines for end-stage heart disease and which belie a legitimate terminal diagnosis. M.S. elected to revoke hospice shortly after her husband's death in early 2014.

39. Patient W.P., a 76-year-old male, was admitted to First Choice Hospice in Elba, Alabama on May 3, 2011 with a diagnosis of end-stage heart disease and certified as terminally ill by First Choice medical director Dr. Lance Dyess. When Relators Linda Reed and Jessica Smith visited W.P. at home, they noted that W.P. did not use oxygen and would drive to his workshop every day

where he would independently "tinker" in the shop – all clinical facts at odds with Medicare guidelines for end-stage heart disease and which belie a legitimate terminal diagnosis. W.P. was discharged on May 25, 2014.

40.     Patient L.H., a 72-year-old female, was admitted to First Choice Hospice in Andalusia, Alabama on July 30, 2014 with a diagnosis of heart disease and was certified as terminally ill by First Choice medical director Dr. Charles Wood. Relator Jessica Smith overheard a conversation in which Tara Norris, Outreach Development, stated that Dr. Crowe refused to follow the patient as she was not appropriate for hospice but that Carolyn Burbank, Administrator, had said that she would have the medical director sign off on L.H. despite her not being appropriate for hospice.

41.     Patient J.R., a 67-year-old female, was admitted to First Choice Hospice in Elba, Alabama on May 22, 2014 with a diagnosis of Alzheimer's disease.     First Choice medical director Dr. Charles Wood certified J.R. as terminally ill.   However, when Relator Linda Reed visited the patient's home to conduct a psychosocial assessment, she noted that J.R. was sitting in the living room talking to her daughter and grandson.  J.R. was able to answer all questions that she was asked during the assessment and was alert and oriented x2.  Ms. Reed also noted that J.R. is independently ambulatory and is able to feed herself – all

clinical facts at odds with Medicare guidelines for Alzheimer's disease and which belie a legitimate terminal diagnosis.

42.    Patient J.G., a 66-year-old male, was admitted to First Choice Hospice in Elba, Alabama on May 9, 2014 with a diagnosis of end-stage COPD and was certified as terminally ill by Dr. Henry King. However, when Relator Jessica Smith visited the patient's home, she noted that J.G. worked in the garden all day, smoked frequently (while wearing oxygen), and continues to be involved in the community – all clinical facts at odds with Medicare guidelines for end-stage COPD and which belie a legitimate terminal diagnosis.

43.    Patient M.H., a 67-year-old female, was admitted to First Choice Hospice in Elba, Alabama on December 27, 2012 with a diagnosis of end-stage COPD and certified by First Choice medical director Dr. Charles Wood. However, when Relators Linda Reed and Jessica Smith visited the patient in her home, they noted that M.H. did not use oxygen, regularly went shopping, cleaned, and frequently watched her two young grandchildren – all clinical facts at odds with Medicare guidelines for end-stage COPD and that render M.H.'s terminal diagnosis totally implausible. M.H. was discharged on March 31, 2014.

44.    Patient R.B., a 64-year-old male, was admitted to First Choice Hospice in Andalusia, Alabama on January 10, 2014 with a diagnosis of COPD/lung disease. However, Relator Jessica Smith noted when visiting the

patient that he does not wear oxygen and is seeking aggressive treatment for his terminal condition from the Veteran's Administration at Sacred Heart Hospital. As such, R.B. is not eligible for the Medicare Hospice benefit.

## II.  Defendant Systematically Admits Patients Without the Knowledge of Patients' Primary Physician

45.  Defendant systematically admits patients without the knowledge or approval of patient's primary physician.

46.  The following patients are examples of the Defendant knowingly admitting patients without the knowledge of the patient's primary physician:

47.  Patient N.K., a 93-year-old female, was admitted to First Choice Hospice in Elba, Alabama on November 25, 2013 with a diagnosis of heart disease and certified as terminally ill by First Choice medical director Dr. Anna Lee Walding. N.K. was admitted without her primary physician's knowledge. When N.K.'s primary physician, Dr. Davis Rhynne, found out that First Choice had admitted N.K. to hospice, he angrily called the agency and demanded that they discharge N.K. as she is not appropriate for hospice.

48.  Patient J.R., a 76-year-old male, was admitted to First Choice Hospice in Elba, Alabama on November 26, 2013 with a diagnosis of Parkinson's Disease and certified as terminally ill by First Choice medical director Dr. Charles Wood. J.R. was admitted without his primary physician's knowledge. When he found out,

Dr. William Reynolds called Administrator Carolyn Burbank and told her that J.R. is not appropriate for hospice and should be discharged immediately.

49.     Patient A.D., a 91-year-old female, was admitted to First Choice Hospice in Elba, Alabama on March 4, 2014 with a diagnosis of Heart Disease and certified as terminally ill by First Choice medical director Dr. Charles Wood. When A.D.'s primary physician, Dr. William Reynolds, found out that his patient had been admitted to hospice, he immediately called and complained to Administrator Carolyn Burbank that his patient was not appropriate for hospice and demanded that she be discharged.

50.     By and through all of the circumstances described, *supra*, Defendant has violated the healthcare laws and regulations of the United States, undermined the noble intention and mission of Hospice, defrauded the United States of America, and jeopardized the already strained Medicare program.

## COUNT ONE
## PRESENTING OR CAUSING TO BE PRESENTED FALSE CLAIMS
## UNDER 31 U.S.C. § 3729

51.     Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

52.     By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – presented or caused to be

presented false or fraudulent claims to the United States for payment or approval, to wit:

(a) Defendant submitted false claims for Hospice care provided to patients whom Defendant knew did not meet Medicare or Medicaid requirements for Hospice, in violation of 42 U.S.C. §1395y;

(b) Defendant submitted false claims for Hospice care provided to patients who were under the care of a treating physician, but who were not certified as terminally ill by that physician and were instead admitted without his or her knowledge, in violation of 42 C.F.R. § 418.22(c).

(c) Defendant submitted false claims for Hospice services premised upon Defendant's fraudulent certifications of compliance with Medicare regulations as made on CMS Forms 885A and 1450 and elsewhere;

53. The United States paid the false claims described herein and summarized in paragraph 52(a)-(c).

54. Defendant's fraudulent actions, as described *supra*, are part of a widespread, systematic pattern and practice of knowingly submitting or causing to be submitted false claims to the United States through fraudulent certification and re-certification of Hospice patients and fraudulent billing of the United States through Medicare or Medicaid.

55. Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant and others by the United States through Medicare and Medicaid for such false or fraudulent claims.

WHEREFORE, Relators demand judgment in their favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relators may be entitled.

**COUNT TWO**
**MAKING OR USING FALSE STATEMENTS OR RECORDS MATERIAL**
**TO A FALSE CLAIM UNDER 31 U.S.C. § 3729**

56. Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

57. By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim or to get a false or fraudulent claim paid or approved by the United States, to wit:

(a) Defendant created and used false certifications of terminal illness; false patient charts designed to make patients appear terminally ill, when they were

not; and other false records intended to support its fraudulent billing to the United States, all in violation of 42 U.S.C. §1395y and the Medicare regulations cited *supra*.

(b)    Defendant made false certifications regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the United States through Medicare or Medicaid, including false certifications on CMS Forms 885A and 1450 as described *supra*, when Defendant was aware that its practices as described herein were in violation of Medicare payment prerequisites, including but not limited to 42 U.S.C. §1395y and the applicable LCDs.

58.    The false records or statements described herein were material to the false claims submitted, or caused to be submitted, by Defendant to the United States.

59.    In reliance upon Defendant's false statements and records, the United States paid false claims that it would not have paid if not for those false statements and records.

60.    Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant and others by the United States for such false or fraudulent claims.

WHEREFORE, Relators demand judgment in their favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages

sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relators may be entitled.

## COUNT THREE
## "REVERSE FALSE CLAIMS" UNDER 31 U.S.C. § 3729(a)(1)(G)

61.　Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

62.　By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the United States, or knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money or property to the United States, to wit:  Defendant knew that it had received Hospice *per diem* payments for patients who did not qualify for Hospice, yet Defendant took no action to satisfy its obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States.

63.　As a result of Defendant's fraudulent conduct, the United States has suffered damage in the amount of funds that belong to the United States but are improperly retained by Defendant.

WHEREFORE, Relators demand judgment in their favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relators may be entitled.

### COUNT FOUR
### CONSPIRACY UNDER 31 U.S.C. § 3729(a)(3)

64.     Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

65.     Defendant knowingly presented, or caused to be presented, false or fraudulent claims to the United States for payment or approval, to-wit: Defendant knowingly certified and/or re-certified Hospice patients whom it knew did not qualify for Medicare or Medicaid reimbursement and presented or caused to be presented false claims to the United States through Medicare or Medicaid for payment of same.

66.     The United States paid Defendant for such false claims.

67.     Defendant, in concert with its principals, agents, employees, subsidiaries, and other institutions did agree to submit such false claims to the United States.

68.     Defendant and its principals, agents, and employees acted, by and through the conduct described *supra*, with the intent to defraud the United States

by submitting false claims for payment to the United States through Medicare or Medicaid.

69.    Defendant's fraudulent actions, together with the fraudulent actions of its principals, agents and employees, have resulted in damage to the United States equal to the amount paid by the United States to Defendant and others as a result of Defendant's fraudulent claims.

WHEREFORE, Relators demand judgment in their favor on behalf of the United States and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees, costs, interest, and such other, different, or further relief to which Relators may be entitled.

Date:  October 16, 2014

_Carrie M. Motes_
JAMES F. BARGER JR.
J. ELLIOTT WALTHALL
CARRIE M. MOTES

**Attorneys for Relators Linda Reed and Jessica Smith**

**OF COUNSEL**

FROHSIN & BARGER, LLC
3430 Independence Drive, Suite 40
Birmingham, Alabama 35209
Tel:   205.933.4006
Fax:   205.933.4008

**RELATOR DEMANDS A TRIAL BY STRUCK JURY**

## CERTIFICATE OF SERVICE

On this the 16th day of October, 2014, Relators hereby certify that in compliance with Federal Rule 4 of the Civil Rules of Procedure, service of the *Qui Tam* Complaint has been executed as follows:

**By Certified Mail to:**

United States Attorney George Beck
Attn: AUSA Bob Anderson
131 Clayton Street
Montgomery, Alabama 36104

Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

*Tanie M. Motes*
OF COUNSEL