IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

UNITED STATES OF AMERICA )
*ex rel.* Linda Reed and Jessica Smith, )
)
    Plaintiffs, )
) Case No: 2:14-cv-01060-MHT-WC
v. )
)
FIRST CHOICE HOSPICE, INC., )
)
    Defendant. )

## RELATORS' RESPONSE BRIEF ADDRESSING ALTERNATE REMEDY ISSUES

Pursuant to the Court's Order of February 3, 2022 (Doc. 77), Relators hereby respond to the Government's Brief of January 22, 2021 (Doc. 75), as follows:

In their initial Joint Response to the Court's December 22 Order, Relators (jointly with the Defendant) offered background information about this case for the purpose of responding to the Court's request and informing the Court of the circumstances of the current situation as Relators understand it. *See* Doc. 72. In its Reply brief, the Government took issue with Relators' account and made factual representations of its own. *See* Doc. 75. No actual evidence has been produced in support of any of these representations at this stage, however. While Relators could further rebut the Government's assertions, the divergent factual accounts simply serve to demonstrate that the factual background is opaque at best and only support Relators' position that that the Court should order a limited discovery period or

1

alternatively, issue a Show Cause Order requiring the United States to demonstrate its position that the plain language of 31 U.S.C. § 3730(c)(5) (the "Alternate Remedy Provision") does not apply, producing all of the relevant documents so that all parties and the Court can understand the nature of the Government's monetary recoveries from Defendant First Choice and whether the Alternate Remedy Provision of the FCA is implicated.

Relators' position is that the Court holds jurisdiction to address Relators' potential claims against the Government. Relators reached an agreement with Defendant to dismiss it *pro tanto* from this case based on the Court's December 22 Order and impending trial date and because the Government had already seized the resources that Defendant might use to pay any judgment in this case. Relators' dismissal was expressly *pro tanto* and Relators explicitly preserved their claims to an alternate remedy. Manifestly, this case is still open and pending. Accordingly, Relators request that, at minimum, the government be required to produce the underlying information. Allowing the United States to skirt its obligations under the FCA on the strength of a bare representation would deprive the statute of its intended purpose and would radically chill the whistleblowing activity that the FCA is designed to incentivize.

## I. The False Claims Act

The *qui tam* provisions of the False Claims Act (FCA) allow private individuals ("Relators") with knowledge of fraud against the United States to file suit on behalf of the United States. 31 U.S.C. §3730(b). The purpose of the FCA is to "encourage any individual knowing of Government fraud to bring that information forward."[1] In the face of sophisticated and widespread fraud, Congress created the modern FCA because it believed "only a coordinated effort of both the Government and the citizenry will decrease this wave of defrauding public funds."[2]

To further these goals, the FCA provides specific statutory rights to Relators. *See* 31 U.S.C. § 3730. *Qui tam* Relators are statutorily entitled between 15-25% of the Government's recovery if the Government intervenes in the case and 25-30% of the Government's recovery if the Government declines to intervene, and the Relator brings the action. 31 U.S.C § 3730(d). Upon being provided with a Relator's information through a *qui tam* Complaint, the "Government may elect to pursue its claim through any alternate remedy available to the Government, including any administrative proceeding." 31 U.S.C. § 3730(c)(5). However, the FCA provides: "the person initiating the action shall have the same rights in such proceeding as such person would have had if the action continued under the [False Claims Act]. *Id.*

---

[1] S. REP. 99-345, 2, 1986 U.S.C.C.A.N. 5266, 5266

[2] *Id.*

Courts have consistently looked to the unambiguous language of 31 U.S.C. § 3730(c)(5) to interpret its application. *See U.S. ex rel. Bledsoe v. Community Health Systems, Inc.,* 342 F.3d 634, 647 (6th Cir. 2003) ("'Alternate remedy' refers to the government's pursuit of **any alternative to intervening in a relator's qui tam action."**) (emphasis added). "The Ninth Circuit adopts a similarly broad interpretation of 'alternate remedy,' noting that it is "entirely consistent" with the FCA purpose to read any "alternate remedy" to "mean what is says." *United States ex rel. Kuriyan v. HCSC Insurance Services Co.,* 2021 WL 5998603, at *45 (D.N.M., 2021) citing *United States ex rel. Barajas v. United States*, 258 F.3d 1004, 1012 (9th Cir. 2001). The Eleventh Circuit has yet to rule on its interpretation of the Alternate Remedy Provision. However, based upon the clear statutory language, the instructive case law, and facts of this case – Relators have established a plausible claim under the Alternate Remedy Provision and at minimum are entitled to limited discovery to determine the extent of the Alternate Remedy Award to which Relators could be entitled. Any interpretation of 31 U.S.C. § 3730(c)(5) that denies Relators even the basic right to have a determination made based upon a discovery of the relevant evidence and factual findings related to the Government's recoveries of monies from Defendants during the pendency of this action as a result of false claims for hospice services would render that portion of the statute meaningless.

 II. **Factual Background Available to Relators**

4

Relators filed this case in October 2014, and worked cooperatively with the Department of Justice (DOJ) and the Department of Health and Human Services (HHS) for years while the Government investigated Relators' claims. Relators were interviewed by HHS agents and DOJ attorneys and provided the names and contact information of numerous witnesses otherwise unknown to the Government whom HHS-OIG agents also interviewed. Relators also provided specific examples of ineligible hospice patients to the Government—which Relators understand were investigated by HHS-OIG. HHS-OIG agents informed Relators' counsel that the additional witnesses and the investigation of specific patients corroborated Relators' allegations that Defendant made false claims for payment to Medicare for hospice services as alleged in Relator's Complaint.

Relators further understand that, based upon the valuable and credible information provided by the Relators, the Department of Justice commissioned a medical expert to conduct a review of Defendant's medical records. The goal of this review was to identify and quantify damages related to Relators' allegations of ineligible hospice patients for whom the Defendant billed the Government. Relators understand that this medical review indeed corroborated Relators' allegations and the Defendant did, in fact, bill Medicare for non-terminal, ineligible, hospice patients. Nevertheless, the Government declined to intervene in the case and in

2019, the case was unsealed and Relators served the case on the Defendant. *See* Doc. 34, 42, 46.

Although the FCA initially affords the Government only 60 days to investigate a Realtor's claims, the Government extended its investigation for five years with the Relator's consent and cooperation but without ever informing Relators until after it had decided not to intervene (and only after repeated inquiries by Relators) that the Government was at that very same time recovering millions of dollars from Defendant and effectively rendering it judgment-proof.

As detailed in the Parties Joint Response, after the United States declined to intervene, Relators learned that the United States administratively recovered roughly $5 million from Defendant during the pendency of this lawsuit. *See* Doc. 72. As Relator currently understands the facts, these recoveries were related to claims for hospice services that violated Medicare conditions of payment; and consequently, mirror Relator's allegations that Defendant violated "Medicare billing requirements, or compliance with other federal healthcare laws and regulations." *See* Doc. 1 at ¶ 3. Moreover, these recoveries rendered Defendant financially unable to pay the treble damages and civil penalties that Relators sought in this litigation or even a small fraction of the costs of prosecuting this action, which otherwise potentially would be recoverable under 31 U.S.C. 3730(d)(1). *See* Doc. 72.

Therefore, in a practical and legal sense, the Government declined to intervene in Relators' action but instead administratively recovered the claims and funds at issue in Relators' case, therefore implicating the Alternate Remedy Provision. *See United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.,* 501 F.3d 493, 522 (6th Cir. 2007).

It is certainly plausible that instead of pursuing costly and extensive litigation against an entity with limited resources such as Defendant, the United States determined a more prudent, alternative, course of action was to simply administratively recover $5 million from the Defendant. That is the United States' prerogative; but Relators retain their rights to a portion of that administrative recovery. *U.S. ex rel. Bledsoe v. Community Health Systems, Inc.,* 342 F.3d 634, 647 (6th Cir. 2003) (Alternate Remedy is implicated when the government pursues "***any alternative*** to intervening in a relator's *qui tam* action." (emphasis added); *See also United States v. L-3 Communications EOTech, Inc.,* 921 F.3d 11, 30 (2nd Cir. 2019) (The Alternate Remedy Provision "entitles a person who brought a *qui tam* action to share in the recovery gained by the government in a proceeding it has pursued as an alternative to the *qui tam* action, if the relator's *qui tam* action was pending when the government was choosing what course to pursue").

### III. The Alternate Remedy Provision as Applied to Relators' Claims.

Relators have expended significant efforts to discover facts underlying its alternate remedy claims, including reviewing documents produced by the Defendant. Everything Relators have reviewed indicate that an award is due under the FCA. Much of the other information, however, resides with the Government, which has not yet produced it.

As the Government acknowledges, Relators' Counsel indeed attempted to establish Relators' rights under the Alternate Remedy Provision without involving the Court. *See* Doc. 75 at 3-4 (describing communication between counsel for the Government and Relators Counsel.) The sum result of these extensive efforts, however, consisted of counsel for the United States verbally stating its position in a conference call. The United States provided no documentation substantiating its position nor any evidence to verify its statements. Objectively, more information is required for Relators' counsel to discharge their duties to their clients and perform the required due diligence to determine whether Relators are entitled to a recovery under the Alternate Remedy Provision. If the Government could avoid paying a Relators' Award by effectively stating "we don't think you have an Alternate Remedy claim"—when roughly five million dollars relating to the precise claims alleged in Relators' complaint have been recovered during the pendency of this action—the Alternate Remedy Provision would be meaningless.

One category of potential Alternate Remedies recovered by the Government relates to "Claims Adjustments."[3] Defendant has produced to Relators the Notices of "Claims Adjustments" sent to it by Medicare. In these Notices, Medicare informed Defendant that it had received "overpayments" and demanded that Defendant repay the overpayment amounts to Medicare. Medicare further informed Defendant: "You billed and/or received payment for services that ***you should have known you were not entitled to.*** Therefore, you are not without fault and are responsible for repaying the overpayment." (emphasis added).

As initial matter, these Notices contradict the Government's Reply brief to the extent the Government argues that the administrative recoupments at issue did not establish a showing of scienter. *See* Doc. 75 at 4. These Notices establish the precise scienter standard required under the False Claims Act. *See United States ex rel. Wallace v. Exactech, Inc.*, 2020 WL 4500493, at *16 (N.D.Ala., 2020) citing *United States ex rel. Phalp v. Lincare Holdings, Inc.,* 857 F.3d 1148, 1155 (11th Cir. 2017) (the False Claims Act requires showing "***defendant knew or should have known***

---

[3] As the Government points out, another category of Administrative Recoupments that Relators have discussed with the Government relates to "Hospice CAP Adjustments." Relators maintain that additional information is required to determine whether these Hospice CAP Adjustments implicate the Alternate Remedy Provision because there is evidence that indicates these payments were not merely automated recoupments that were independent of heightened scrutiny on FCH. For instance, the frequency of Hospice CAP Adjustments indicates that Hospice CAP Adjustments were utilized more frequently against First Choice than the standard annual Adjustment.

9

that its conduct violated regulations or statutes") (emphasis added). Nevertheless, while the language of the administrative recoupment letters shows the similarity between Relators' claims and the recoupments, the scienter standard is irrelevant to the application of the Alternate Remedy Provision because the Alternate Remedy is implicated when the government pursues "***any alternative*** to intervening in a relator's *qui tam* action," and does not require that the alternative action have the same scienter standard as the FCA. *See U.S. ex rel. Bledsoe v. Community Health Systems, Inc.,* 342 F.3d 634, 647 (6th Cir. 2003) (emphasis added). *See also* 31. U.S.C. 3730(c)(5).

Further, an examination of the very D.C. Circuit opinion relied upon by the Government shows that the "Claims Adjustments" implicate the Alternate Remedy Provision. *See* Doc. 74 at 4-5 citing *United States v. Novo A/S*, 5 F.4th 47, 57 (D.C. Cir. 2021) (*Novo A/S*). In *Novo A/S*, the Court held that "the claim pursued through an alternate remedy must be one that could have continued instead under the False Claims Act." *Novo A/S*, 5 F.4th 47, 57 (D.C. Cir. 2021). The claims recovered through the Claims Adjustments could have continued instead under the FCA because the Defendant submitted claims for hospice services to Medicare for which the Defendant should have known it was not entitled to payment. *See United States v. AseraCare, Inc.*, 938 F.3d 1278, 1304 (11th Cir. 2019). These are precisely the allegations made in Relators' Complaint that was pending at the time the

Government elected to pursue recovery through an administrative claim adjustment. In fact, despite already recovering the funds at issue and leaving the Defendant judgment proof, the Government disingenuously faults Relators for not continuing to pursue these claims under the FCA, stating "that is the attendant risk with litigating a False Claims Act matter after the United States has declined to intervene." Doc. 75 at 4. Contrary to the Government's position, however, the Alternate Remedy Provision of the FCA specifically provides protection for Relators against this risk that the Government will decline to intervene and syphon all of the monies away from the litigation, rendering the Defendant judgment proof, while side-stepping the Congressional mandate to award Relators a share of the recovery. 31 U.S.C. 3730(c)(5).

Therefore, because the Claims Adjustment administrative recoupments clearly could have continued under the False Claims Act, Courts then look to whether there is "factual overlap between the claim or claims settled by the government and the claims brought by the relators." *Rille v. PricewaterhouseCoopers LLP*, 803 F.3d 368, 374 (8th Cir. 2015); *See also Novo A/S*, 5 F.4th 47, 57 (D.C. Cir. 2021) (holding factual overlap is necessary to qualify as an alternate remedy). With only the facts available to them at this point, Relators have established a prima face case that there is factual overlap between the Claims Adjustment Recoupments because the Claims Adjustments were the same claims

11

alleged to be false by the Relators and the Claims Adjustments were recovered while this case was pending. Specifically, this case was filed in October 2014 and between March 30, 2015 and June 14, 2021, Medicare recovered some $242,449.06 from Defendants based on these Claims Adjustment recoupments.

The Government asserts that Relators are not entitled to an Alternate Remedy on the theory that the Claims Adjustments, at least in part, were due to a "targeted medical review by a CMS contractor, which stemmed from complaint made to the HHS-OIG well before Relators filed their *qui tam* Complaint." See Doc. 75 at 4. First, the admission that the Claims Adjustment were due to a "targeted audit" based on an HHS-OIG complaint renders this case distinguishable from the only Eleventh Circuit District Court case cited by the Government. *See* Doc. 75 at 3 citing *S. Fla. Water Mgmt. Dist. v. Fed. Emergency Mgmt. Agency*, No. 13-80533-CIV, 2014 WL 12968080, at *2 (stating ***routine auditing*** and administrative review does not qualify as an alternate remedy) (emphasis added). However, even if a targeted medical review conducted by a CMS contractor "began prior to Relator's disclosures to the Government or the initiation of the *qui tam* action," it does not foreclose the possibility of an Alternate Remedy recovery, but instead it requires the Court to determine whether the claim is "one that otherwise could be prosecuted through a *qui tam* suit." *United States ex rel. Kuriyan v. HCSC Insurance Services Co.,* 2021 WL

5998603, at *46 (D.N.M., 2021) citing 31 U.S.C. § 3730(b) and *United States ex rel. Kennedy v. Novo A/S*, 5 F.4th at 55.

While Relators maintain that the Alternate Remedy Provision is implicated because (1) the Claims Adjustments could have continued under the False Claims Act and (2) have factual overlap with Relators Allegations; at minimum, the analysis requires further factual development. *See United States ex rel. Kuriyan v. HCSC Insurance Services Co.*, 2021 WL 5998603, at *38 (D.N.M., 2021) ("entitlement to alternate-remedy award is treated as appropriate only upon a factual determination, like in a summary judgment motion" and "must resolve the factual question whether [an administrative audit] recoupment is the type that the FCA recognizes").

Facts that could be helpful to Relators and the Court include the answers to the following questions: (a) what was basis of any relevant HHS complaint? (b) what HHS-OIG action was taken in response? (c) when was any potential action taken and (d) how did Relators' *qui tam* Complaint impact any targeted medical review and corresponding claims adjustments? Even if the HHS-OIG complaint was relevant to the targeted review, was the targeted medical review initiated prior to Relators' Complaint being filed? Or was the HHS-OIG complaint submitted and then upon also receiving Relators' Complaint, the Government initiated the targeted medical review? Was the targeted medical review continued or expanded due to Relators allegations? Indeed, it seems implausible that an anonymous HHS-OIG

13

hotline tip could solely initiate a targeted medical review; while a simultaneous filed *qui tam* Complaint alleging the same fraud was investigated under seal for more than four years but had no bearing on the ongoing administrative recoupments. Yet, apparently, that is the Government's position. Apparently, the Government troubled this Court with multiple requests for extensions of the seal in order to investigate claims that it was already and exclusively investigating pursuant to a single anonymous hotline call.

    Because Relators have plausibly established that they are entitled to an award under the Alternate Remedy Provision, Relators respectfully request that the Court allow limited discovery into the facts surrounding the "targeted medical review," Claims Adjustment Recoupments, and other related recoupments. Or in the alternative, Relators respectfully request that the Court issue a Show Cause Order requiring the Government to provide definitive documentation that demonstrates there are no genuine disputes of material fact as to whether (1) the Claims Adjustment Recoupments could not have continued under the FCA and (2) Claims Adjustment Recoupments did not have factual overlap with Relators' claims. Finally, Relators suggest that mediation could be appropriate to resolve these issues.

    Dated: March 2, 2022

                                         s/ J. Elliott Walthall
                                         JAMES F. BARGER JR.

J. ELLIOTT WALTHALL

**Attorneys for Relators Linda Reed and Jessica Smith**

**OF COUNSEL**

FROHSIN BARGER & WALTHALL
100 Main Street
Saint Simons Island, Georgia 31522
Tel: 205.933.4006
Fax: 205.933.4008

**CERTIFICATE OF SERVICE**

On this the 2nd day of March, 2022, Relators hereby certify that the foregoing has been filed through the CM/ECF system, which will serve all counsel of record.